Oral Argument Not Yet Scheduled

No. 25-5217

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

J.G.G., et al.,
*Plaintiffs-Appellees,*
*v.*
DONALD J. TRUMP, in his official capacity as President of the
United States, et al.,
*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
No. 1:25-cv-00766
The Hon. James E. Boasberg

# EMERGENCY MOTION(S) FOR LEAVE TO INTERVENE
# FOR THE LIMITED PURPOSE OF UNSEALING PLAINTIFFS-
# APPELLEES FULL NAMES AND MOTION TO UNSEAL

PAUL M. DORSEY
*Pro-Se*
110 Westminster Drive
West Hartford, CT  06107
(860) 521-0081
*p.dorsey@comcast.net*

RECEIVED JUN 1 6 2025

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

Pursuant to Circuit Rule 47.1(c) ("Motion to Unseal"), which has no corresponding federal rule, Paul M. Dorsey, *pro-se* moves to unseal Plaintiffs-Appellees full names. To procedurally accomplish this unsealing, Dorsey first moves for permissive intervention for the limited purpose of filing the Motion to Unseal.

Other than FRAP Rule 15 ("Review or Enforcement of an Agency Order—How Obtained; Intervention"), which is not applicable here, no specific Federal Rule of Appellate Procedure governs intervention.   However, FRCP 24(b) ("Permissive Intervention") is frequently used by U.S. Courts of Appeals.

This motion is filed as an emergency motion pursuant to Supreme Court guidance/instructions. *See A.A.R.P. v. Trump*, 605 U. S. ____, _____ (2025). No. 24A1007 ("[w]e recognize the significance of the Government's national security interests as well as the necessity that such interests be pursued in a manner consistent with the Constitution.  In light of the foregoing, lower courts should address AEA cases expeditiously").

In addition, "contemporaneous review in the forum of public opinion is an effective restraint on the possible abuse of judicial power" *Wash. Post Co. v. Robinson* 935 F.2d 282, 289 (D.C. Cir. 1991) (internal quote and citation omitted). Also "[s]ecrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges" *Nebraska*

*Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976). See *Associated Press v. U.S. Dist. Court*, 705 F.2d 1143,1147 (9th Cir. 1983) (48 hour delay in public release of filed documents violates the access right). The following exhibits are attached:

Exhibit 1: ECF #117    Memorandum and Opinion - 6 pgs
Exhibit 2: ECF #113    Petitioners-Plaintiff' Supplemental Motion for Leave to
                       Proceed Under Pseudonyms -10 pgs
Exhibit 3: ECF #102-08 Declaration of D.A.R.H. (next friend to Andry Jose
                       Hernandez Romero) – 4 pgs
Exhibit 4: ECF #102-09 Declaration of M.Z.V.V. (next friend to J.A.B.V) - 4 pgs
Exhibit 5: ECF #102-10 Declaration of M.Y.O.R. (next friend to M.A.O.R.)-4 pgs
Exhibit 6: ECF #102-11 Decl of M.M.A.A. (next friend to G.A.A.A.) - 5 pgs
Exhibit 7: ECF #102-12 Decl of Dorys Mendoza (next friend to M.R.M) – 5 pgs

## INTRODUCTORY BACKGROUND

This appeal is the fourth appeal to be made in the underlying "turn the plans around" Alien Enemy Act ("AEA") case in the District Court (case #25-cv-766). Four of the six underlying plaintiff-appellees and four of their six Next Friends are before this court, in this appeal, under pseudonym, as they were in the district court. The current set of plaintiff-appellees were added to the underlying case, via an amended complaint (ECF #101) on April 24, 2025 – which was after the previous three appeals to this Court were filed. These new plaintiff-appellees submitted a Supplement Motion to Proceed Under Pseudonyms (ECF # 113, filed May 6, 2025). This Movant is objecting to their pseudonym-status here because the District Court erred in granting plaintiff-appellees pseudonym-status.

Five other plaintiff-appellees are also before this court – in appeal 25-5124 – under pseudonym, as they were in the district court (again, case #25-cv-766). This Movant filed an emergency motion to intervene in that appeal on April 25, 2025, for the purpose of opposing those plaintiff-appellees pseudonym status.

On June 11, 2025, this Movant express mailed a Motion to Intervene to the District Court in case 25-cv-766 for the purpose of challenging the pseudonym status of the plaintiff-appellees in both 25-5124 and 25-5217 (in other words, every litigant with pseudonym status). As of the express mailing of this motion, the Motion to Intervene in the District Court has not yet posted to the District Court docket.

Circuit Rule 47.1(c) allows for this court to decide for itself whether the plaintiffs-appellees can proceed pseudonymously: ("On appeals from the district court, the motion will ordinarily be referred to the district court . . . but the court may, when the interests of justice require, decide that motion . . . "). In the interest of justice, specifically the Supreme Court's instruction that AEA cases should be addressed expeditiously, this court should exercise that right, without referral back to the district court.

Procedurally, this motion is NOT an appeal of the district court's order and opinion that granted pseudonym status to the plaintiffs (ECF #117). Argument supporting intervention follows immediately below. Argument supporting

unsealing of the plaintiffs' full names follows after that (see page 9). Argument supporting unsealing of the next friends' full names follows after that (see page 16).

### Argument Supporting Intervention

It is well established under common law that nonparties have standing to intervene to gain public access to sealed court documents. See *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) ("It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.").

This Court has held that "third parties may be allowed to permissively intervene under Rule 24(b) for the limited purpose of seeking access to materials that have been shielded from public view either by seal or by a protective order." *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998); see also *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 300 F.R.D. 19, 21 (D.D.C. 2013) (the Rule 24(b)(1) standard is relaxed when, as here, intervention is sought for the limited purpose of challenging whether documents should remain sealed); *In re Guantanamo Bay Detainee Continued Access to Counsel,* 968 F. Supp. 2d 222, 224 (D.D.C. 2013) (same). This Court has also acknowledged that "every circuit court that has considered the question has come to the conclusion that

nonparties may permissibly intervene for the purpose of challenging confidentiality orders." *EEOC*, 146 F.3d at 1045-46.

The discretion inherent in allowing permissive intervention under Rule 24(b) should be exercised liberally when, as here, Dorsey seeks to intervene solely to unseal records. See *EEOC*, 146 F.3d at 1046; see also *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25068, at *29 n.4 (D.D.C. Mar. 19, 2001) ("The requirements for permissive intervention are to be construed liberally, with all doubts resolved in favor of permitting intervention."); *In re Fort Totten Metrorail Cases*, 960 F. Supp. 2d 2, 5 n.3 (D.D.C. 2013) (granting motion "for the limited purpose of seeking access to materials that have been shielded from public view either by seal or by a protective order.").

Although the traditional elements of Rule 24(b) do not apply here because of Dorsey's limited purpose in seeking to have records unsealed, they are nonetheless satisfied. Specifically, Rule 24(b)(1)(B) requires proposed intervenors to plead: "(1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *EEOC*, 146 F.3d at 1046. In addition, courts also consider whether intervention will unduly delay or prejudice the adjudication of the original parties' rights. See Fed. R. Civ. P. 24(b)(3).

**1. Dorsey Is Not Required to Establish Subject Matter Jurisdiction.**

"An independent jurisdictional basis is simply unnecessary when the movant seeks to intervene only for the limited purpose of obtaining access to documents covered by seal." *EEOC*, 146 F.3d at 1047.  This logic fully applies to Dorsey's motion.  And the reason for this exception is obvious: "[S]uch intervenors do not ask the district court to exercise jurisdiction over an additional claim on the merits, but rather to exercise a power that it already has, namely the power to modify a previously entered confidentiality order." *Id.* Accordingly, Dorsey is not required to establish subject matter jurisdiction for his proposed intervention.

### 2. Dorsey's Motion Is Timely.

Whether a permissive intervention motion is timely requires consideration of "all the circumstances, especially the time elapsed since the inception of the suit, the purpose for which intervention is sought, the need for intervention as a means of preserving the applicant's rights, and the probability of prejudice to those already parties in the case." *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 19 (D.D.C. 2010).

Here, the appellant's Notice of Appeal was filed June 10, 2025 – approximately one week ago.  This motion is timely.

### 3. Whether the Plaintiff-Appellees Should Remain Under Pseudonym Is a Common Question of Law or Fact.

Rule 24's requirement of a common question is also liberally construed "when the movant seeks to intervene for the collateral purpose of challenging a confidentiality order." *EEOC*, 146 F.3d at 1047. Courts routinely find that whether the record should be unsealed is itself a common question of law. See, e.g., *Jessup v. Luther*, 227 F.3d 993, 999 (7th Cir. 2000) ("[C]onfidentiality is—in the language of Rule 24(b)(2)—a 'question of law . . . in common' between the Parties and the [intervenor]."); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 778 (3d Cir. 1994) ("By virtue of the fact that the [intervenors] challenge the validity of the Order of Confidentiality entered in the main action, they meet the requirement of Fed. R. Civ. P. 24(b)(2) that their claim must have 'a question of law or fact in common' with the main action.").

The D.C. Circuit permits nonparties to intervene for the limited purpose of unsealing judicial records where the only common question is whether those documents should remain sealed. *EEOC*, 146 F.3d at 1048 (finding that "[n]o particularly strong nexus of fact or law need exist between the two suits when a nonparty seeks to intervene for the sole purpose of gaining access to documents subject to a confidentiality order."). In other words, this "Circuit has adopted a flexible reading of Rule 24(b)'s 'claim or defense' language, 'allowing intervention even in situations where the existence of any nominate claim or

defense is difficult to find.'" *Ctr. for Biological Diversity v. EPA*, 274 F.R.D. 305, 312 (D.D.C. 2011).

These principles are rooted in common sense: if intervenors seeking access to judicial records were required to demonstrate a common question beyond the issue of whether the sealing should continue, then members of the public would effectively lack any mechanism to gain access to such documents. Such a result stands in stark contrast to the D.C. Circuit's mandate that "nonparties may permissively intervene for the purpose of challenging confidentiality orders." *EEOC*, 146 F.3d at 1045-46. Accordingly, this motion to unseal the Plaintiffs' real names presents a common question that supports granting permissive intervention.

## Unsealing Plaintiffs Full Names

### 1. Legal Standard

In evaluating requests for proceeding under pseudonym, the D.C. Circuit applys the five-factor *James* test, as first described in *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993) ("This Court shall join others in this Circuit that apply the five-factor *James* test") *Sandberg v. Vincent* 319 F. Supp. 3d 422, 426 (DC Cir. 2018):

> "[1] [W]hether the justification asserted by the requesting party is
> merely to avoid the annoyance and criticism that may attend any
> litigation or is to preserve privacy in a matter of sensitive and

highly personal nature; [2] whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent non-parties; [3] the ages of the persons whose privacy interests are sought to be protected; [4] whether the action is against a governmental or private party; and, relatedly, [5] the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously."

*Id.*

However, the D.C. Circuit ha[s] no quarrel with the use of the Second Circuit's ten factor list "which encompasses the five factors from *James*, as long as these factors inform the ultimate balancing of the public and private interests at stake." *In re Sealed Case*, 931 F.3d 92, 97 (D.C. Cir. 2019).

The Second Circuit's ten factor list was first invoked in *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185 (2nd Cir. 2008). The seventh factor in that test is the relevant factor here: "(7) whether the plaintiff's identity has thus far been kept confidential" *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 190 (2nd Cir. 2008).

## 2. Argument

### A.      The Four Plaintiff-Appellees (G.A.A.A., M.A.O.R., J.A.B.V., M.R.M.)

As stated in the "Introductory Background" section, this movant is objecting to Plaintiff-Appellees' pseudonym-status here because the District Court erred in granting plaintiff-appellees pseudonym-status. The biggest error that the court made was in not considering as a relevant factor the fact that the names of all the 238 Venezuelans – including the four plaintiff-appellees here – were made publicly available over the internet by a CBS list of those names and that the matching of the initials of the four plaintiff-appellees (J.A.B.V., M.O.A.R., G.A.A.A. and M.R.M.) to unique names on the list is a simple, quick, straightforward process.

Of importance is the fact that the court was made aware of the existence of the CBS list by the Plaintiffs themselves in their Supplemental Motion to Proceed Under Pseudonyms (ECF #113 at pg 7). The Plaintiffs' Supplemental Motion stated "[b]eing named in a public CBS list does not alter the analysis, as the government of El Salvador has no way of knowing which specific individuals who wish to remain anonymous are challenging their detention there, and the general nature of the list does not link any particular anonymous Petitioner to a known person detained at CECOT." (*id* at pg 7).

In addition, Declarations filed by four Next Friends specifically credited the list they saw on the internet or read in the news to explain how they became aware

of the fact that their relatives had been removed from the USA to the CECOT facility in El Salvador: J.A.B.V.'s next friend ("A few days later, I saw J.A.B.V.'s name on a public list of Venezuelans who had been deported to El Salvador.") ECF #102-9, ¶9; M.O.A.R.'s next friend ("I saw my brother's name on a list published by news outlets of Venezuelans taken to El Salvador.") ECF #102-10, ¶2; G.A.A.A.'s next friend (". . . my son's name is on the public list of people who were deported to El Salvador under the Alien Enemies Act.") ECF 102-11, ¶3; and M.R.M.'s next friend ("On Thursday, that fear was confirmed when the list of deported men was published, and Miguel's name was on it.") 102-12, ¶6. It should be noted that M.R.M.'s mother, Dorys Mendoza identifies him by his true first name, and identifies herself by her true name.

In any event, this Movant first became aware of the CBS list of Venezuelans transferred to the CECOT facility by reading about the list in Plaintiffs' Supplemental Motion (again, ECF #113 at pg 7). A quick internet search using a well known search engine ("D.D.G.") quickly yielded the following web – site: *https://www.cbsnews.com/news/venezuelans-deported-el-salvador-names/*.    The list is also available at *https://perma.cc/9M8L-WTL9*.    The relevant portion of Plaintiffs' Supplemental Motion states as follows:

> "Retributive violence is a regular occurrence at CECOT [citation omitted], and such a high-profile challenge to their detention would almost certainly incur consequences for Petitioners. Being named in a public CBS list does not alter the analysis, as the

> government of El Salvador has no way of knowing which specific
> individuals who wish to remain anonymous are challenging their
> detention there, and the general nature of the list does not link any
> particular anonymous Petitioner to a known person detained at
> CECOT."

ECF #113 at pg 7.

Plaintiffs' claim that the government of El Salvador has no way of matching the 238 names on the list – which is in alphabetic order - to the four petitioners' initials is simply untrue. Admittedly, names with four initials can be somewhat cumbersome. But matching the specific, individual plaintiff's initials to a unique name on the list (meaning to the exclusion of all other names on the list) is a straightforward process. This Movant believes that the average citizen could accomplish the simple matching task in under five minutes. And just to be clear, five minutes is the estimate for matching all four names, not the estimate per name.

The five minute estimate is calculated as follows: the first pseudonymized name, "J.A.B.V." requires a review of the fourteen last names that begin with "B" (no need to exam all 238 names!). Only two names match the required "B.V." in "J.A.B.V." Of the two, only one first name can not be eliminated, leaving only one match to the required "J.A." Allowing for 3 seconds to review each of the 14 names beginning with "B" yields 42 seconds. The second pseudonymized name "M.A.O.R." requires a review of only the four last names that begin with "O" (4 names x 3 seconds a name = 12 seconds); The third name, "G.A.A.A" (nine names

start with "A" – 27 seconds); The fourth name, "M.R.M." (thirty six names starting with "R" and twenty five names starting with "M" - so 61 names and 183 seconds). 42 + 12 + 27 + 183 seconds = 264 seconds (or 4 minutes, 24 seconds).

Given the ease and speed at which one can find the true names of the four plaintiff-appellees, Plaintiffs' description of "the general nature of the list" is . . . bizarre. Respectfully, this Movant does not know what the Plaintiffs meant by referring to the list's "general nature" nor why they would choose to describe it that way, other than to confuse the court or otherwise misdirect it.

In any event, the District Court had a judicial duty to investigate the public CBS list once its existence was disclosed to it. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995) ("Although it is within the discretion of the district court to grant the 'rare dispensation' of anonymity against the world (but not the plaintiff), even in that situation the court has 'a judicial duty to inquire into the circumstances of particular cases to determine whether the dispensation is warranted.'") *id* (quoting *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993)).

From the record, it's clear that the District Court's did not inquire into the CBS list: Its Opinion and Order (ECF # 117) is completely silent on the subject of the CBS list and its corresponding implication for the merits of granting pseudonym status to the already disclosed Petitioners. Under the seventh factor in the previously mentioned 2nd Circuit ten factor test, ("(7) whether the plaintiff's

identity has thus far been kept confidential") *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d at 190 (2nd Cir. 2008), the CBS list was a relevant circumstance that should have been factored into the Court's Opinion.

If this were an appeal of the District Court's Order, its failure to consider that the plaintiffs identities had not been kept confidential would be sufficient justification to overturn the District Courts order granting pseudonym status to the Plaintiffs. *See In re Sealed Case*, 931 F.3d 92, 96 (D.C. Cir 2019) ("Although we review de novo the criteria used by a district court to decide whether to grant a motion to proceed anonymously, we review a court's application of those criteria only for an abuse of discretion. In so doing, we must consider "whether the decision maker failed to consider a relevant factor [or] relied on an improper factor, and whether the reasons given reasonably support the conclusion") Internal citations omitted.

But as stated previously in the Introductory Background section, this motion is not an appeal of the District Court's Order granting pseudonym status to the Plaintiffs. Rather, it is a challenge to the Plaintiffs proceeding under pseudonym status in this Court. Because the District Court did not consider the CBS list, this Court should heed the spirit of the Supreme Court's opinion and should address this pseudonym issue in this AEA case expeditiously. In other words, by deciding

for itself whether the four plaintiffs currently housed at CECOT in El Salvador should be allowed to proceed under pseudonym.

## B. The Four Next Friends (D.A.R.H., M.M.A.A., M.Y.O.R., M.Z.V.V.)

There are three reasons why this Court should reject the District Court's granting of pseudonym status to the Next Friends and decide the matter for itself.

1. The District Court's failure to consider the CBS list and its corresponding implication for the merits of granting pseudonym status to Petitioners is also relevant to its decision to grant pseudonym status to three of the four Next Friends. While none of the Next Friends were publicly identified in the CBS list, their true identity would be relatively easy to locate, since three of the four identify their relationship (ie – mother, sister) and their home town and/or home state:  D.A.H.R. ("I am the mother of Andry Jose Hernandez Romero" and "I . . . currently reside in Capacho Nuevo [home town],Tachira [home state], Venezuela") ECF 102-8, ¶1; M.M.A.A. ("I currently live in Tachira [home state], Venezuela and I am the mother of G.A.A.") ECF 102-11, ¶2; M.Y.O.R. ("I am the younger sister of M.A.O.R." and "I . . . live in Barquisimeto [home town], Lara State [home state], Venezuela") ECF 102-10. ¶1.  The sole exception is M.Z.V.V.

2. In granting pseudonym status to the four Next Friends, the District Court stated " . . . Petitioners and their next friends clearly seek to avoid 'retaliatory physical or mental harm.'" (ECF 117 at pg 3).  Not so.  Not one next friend ever

expressed any concern about their own personal safety.  To be sure, three of the four expressed concerns about the safety of their loved ones:  D.A.H.R. - "I am deeply worried about my son's safety" and "I am terrified for my son's safety . . . I fear that he is in danger every day." (ECF 102-8, ¶2, 12); M.Y.O.R. – "I am extremely worried about his health and safety." (ECF 102-10, ¶11); M.Z.V.V. – "I am extremely worried for his safety . . . " (ECF 102-9, ¶2).  It should be noted that the concerns expressed by the Next Friends are concerns about the safety of their loved ones in general and are not concerns about avoiding "retaliatory physical or mental harm," to themselves or the petitioners they represent.

The one Next Friend (M.M.A.A.) who did not express a concern about the safety of her loved one, did manage to mention that "[w]e are from the state of Tachira, VZ where the area is run by a paramilitary group.  Due to the violence in our town at the hands of this group, my son fled." (ECF 102-11, ¶4).  This statement can not be reasonably classified as an expression of concern about safety in general or a concern about avoiding retaliatory physical or mental harm to herself.

3. The Court's Opinion and Order is also flawed due to is its apparent acceptance of the Plaintiffs' false argument that "federal immigration regulations 'provide for the confidentiality of asylum applicants'" (ECF #117 at pg 3).

Plaintiffs claimed that "federal immigration regulations reflect this concern for the sensitivity of asylum applications and the attendant need for confidentiality. Asylum regulations provide for the confidentiality of asylum applicants and credible fear interviewees, including the fact that an applicant has applied for asylum or received a credible fear interview. See 8 C.F.R. §§208.6, 1208.6" (ECF #113 at pgs 5-6).

Plaintiffs' claim is a half-truth teetering on outright deception. Federal immigration regulations actually reflect the overriding, long standing public policy of favoring the American public's interest in open courts over the privacy interests of foreigners attempting asylum. Specifically, 8 C.F.R. §208.6 states, in relevant part:

> (a) Information contained in or pertaining to any application for . . . asylum,
> . . . under section 241(b)(3) of the Act or, [ ] records pertaining to any credible fear determination conducted pursuant to § 208.30, [ ] shall not be disclosed without the written consent of the applicant, except as permitted by this section or at the discretion of the Secretary.
>
> (b) The confidentiality of other records kept by DHS . . . that indicate that a specific alien has applied for . . . asylum . . . under section 241(b)(3) of the Act . . . or has received a credible fear . . . interview [ ] shall also be protected from disclosure, except as permitted in this section.
>
> **(c) This section shall not apply to any disclosure to:**
> [ ]
> **(2) Any Federal, State, or local court in the United States considering any legal action:**

[ ]

**(ii) Arising from the proceedings of which the asylum application, credible fear determination, or reasonable fear determination is a part.**

(d)

(1) **Any information** contained in an application for . . . asylum . . . and applicable information supporting that application, any information regarding an alien who has filed such an application . . . **may be disclosed**:

[ ]

(v) As part of any proceeding arising under the immigration laws, including proceedings arising under the Act; and

(vi) As part of the Government's defense of any legal action relating to the alien's immigration or custody status, including petitions for review filed in accordance with 8 U.S.C. 1252.

(2) If information may be disclosed under paragraph (d)(1) of this section, the disclosure provisions in paragraphs (a), (b), and (c) of this section shall not apply.

8 C.F.R. §208.6 (**Bolding** added).

The regulation, by first imposing a broad, sweeping non-disclosure protocol, then specifically exempting court proceedings from that protocol clearly establishes that, contrary to what Plaintiffs led the District Court to believe, federal immigration regulations do not "reflect" concerns about "sensitivity" of asylum claims - in the context of a court proceeding.  8 C.F.R. §1208.6 is virtually identical to 8 C.F.R. §208.6 and will not be further analyzed.  Federal regulations

specifically authorize disclosure of asylum information: "Any information contained in an application for . . . asylum . . . may be disclosed." *id*

Because federal regulations specifically authorize disclosure of asylum information, the District Court erred in its opinion: "That information is confidential; as Petitioners note, federal immigration regulations 'provide for the confidentiality of asylum applicants,' and administrative and judicial proceedings stemming from asylum applications routinely use pseudonyms. [ ] This factor thus supports pseudonymity" (Court Order, ECF # 117 at pg 3) [internal citation omitted].

As in the case of the four named plaintiffs (G.A.A.A., M.A.O.R., J.A.B.V. and M.R.M.) discussed above in Section A on pages 10-15, if this were an appeal of the District Court's Order, the three above mentioned reasons would be sufficient justification for this Court to overturn the District Court's order granting pseudonym status to the Next Friends.

But, again, this motion is not an appeal of the District Court's Order granting pseudonym status to the Plaintiffs or their Next Friends. Rather, it is a challenge to the Plaintiffs and their Next Friends proceeding under pseudonym status in this Court. For the three reasons stated, this Court should heed the spirit of the Supreme Court's opinion and should address this pseudonym issue in this AEA

case expeditiously. In other words, by also deciding for itself whether the four Next Friends should be allowed to proceed under pseudonym.

### 4. Conclusion

For the reasons stated above, this court should:

1) Expeditiously grant limited intervention status to Paul M. Dorsey for the purpose of challenging plaintiffs-appellees' pseudonym status in this Court;

2) Immediately remove plaintiffs-appellees G.A.A.A., M.A.O.R., J.A.B.V. and M.R.M. pseudonym-status without referral back to the District Court.

3) Immediately remove Next Friends D.A.R.H., M.M.A.A., M.Y.O.R. and M.Z.V.V. pseudonym-status without referral back to the District Court.

Or as an alternative to "2" and/or "3" -

2A) Order the plaintiffs-appellees to submit to this court a proper motion to proceed under pseudonyms (e.g. – as was done in this court's *John Doe v. Securities and Exchange Commission*, 24-1362) and then allow for a normal reply from both defendants-appellants AND Intervenor Paul M. Dorsey.

Respectfully Submitted

6/13/2025

Paul M. Dorsey, *pro-se*
110 Westminster Drive
West Hartford, CT 06107
(860) 521-0081
*p.dorsey@comcast.net*

CERTIFICATES FOLLOW:
CERTIFICATE OF COMPLINACE
CERTIFICATE OF SERVICE
CERTIFICATE OF CONFERENCE

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of D.C. Cir. R. 27(c) because it contains 4,630 words.

2. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced and easy-to-read typeface using Microsoft Word97 in 14-point Times New Roman typeface.

_Paul M. Dorsey_
Paul M. Dorsey
*Pro-se*

June 13, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2025, I mailed via United States Postal Service Express Priority Mail, fully postage paid the foregoing motions and certificates to the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit.  The Clerk will upload the motions and certificates in the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and they will receive this motion and certificates via the appellate CM/ECF system.

In addition, I mailed via United States Postal Service, first class mail fully prepaid postage and via electronic mail to the following participants and the listed addresses below:

### PLAINTIFFS-APPELLEES

| | |
|---|---|
| Lee Gelernt (D.D.C. Bar No. NY0408) | lgelernt@aclu.org |
| Daniel Galindo (D.D.C. Bar No. NY035) | dgalindo@aclu.org |
| Ashley Gorski | agorski@aclu.org |
| Hina Shamsi (D.D.C. Bar No. MI0071) | hshamsi@aclu.org |
| Patrick Toomey | ptoomey@aclu.org |

c/o AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004

---

| | |
|---|---|
| Arthur B. Spitzer (D.C. Bar No. 235960) | aspitzer@acludc.org |
| Scott Michelman (D.C. Bar No. 1006945) | smichelman@acludc.org |

c/o AMERICAN CIVIL LIBERTIES UNION FOUNDATION
OF THE DISTRICT OF COLUMBIA
529 14th Street, NW, Suite 722
Washington, D.C. 20045

## CERTIFICATE OF SERVICE (Continued)

<u>DEFENDANTS-APPELLANTS</u>

Drew C. Ensign
Tiberius T. Davis
Abhishek Kambli
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C.  20004

drew.c.ensign@usdoj.gov
tiberius.davis@usdoj.gov
abhishek.kambli@usdoj.gov


Paul M. Dorsey
*Pro-se*

June 13, 2025

## CERTIFICATE OF CONFERENCE

I hereby certify that I contacted Drew C. Ensign, Tiberius T. Davis and Abhishek Kambli counsel for the Defendants-Appellants and Lee Gelernt, Daniel Galindo and Ashley Gorski counsel for the Plaintiffs-Appellees. No counsel responded, however, both counsels previously expressed opposition to my intervention in the District Court.

Paul M. Dorsey
*Pro-se*

June 13, 2025

EXHIBIT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LIYANARA SANCHEZ, as next friend on behalf of FRENGEL REYES MOTA,** *et al.*, <br><br> **Petitioners-Plaintiffs,** <br><br> **J.G.G.,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **DONALD J. TRUMP,** *et al.*, <br><br> **Respondents-Defendants.** | Civil Action No. 25-766 (JEB) |

## MEMORANDUM OPINION AND ORDER

As litigation proceeds in this Court over the Government's invocation of the Alien Enemies Act against Venezuelan nationals alleged to be members of Tren de Aragua, Plaintiffs have amended their Complaint to add habeas petitions from one individual in criminal custody in the United States and several individuals detained at the Centro del Confinamiento del Terrorismo (CECOT) in El Salvador (brought by their next friends). See ECF No. 101 (Am. Compl.). Most of those Petitioner-Plaintiffs and their next friends now seek to proceed pseudonymously, the same as the original Plaintiffs to this suit. See ECF No. 113 (Mot.) at 1. The Court will grant the Motion, subject to any further consideration by the United States District Judge to whom this case is randomly assigned. See LCvR 40.7(f) (providing that Chief Judge shall "hear and determine . . . motion[s] to file a pseudonymous complaint"); id. 5.1(h)(1) ("Absent statutory authority, no case or document may be sealed without an order from the Court.").

## I.  Legal Standard

Generally, a complaint must identify the plaintiffs.  See Fed. R. Civ. P. 10(a); LCvR
5.1(c)(1).  This identification requirement reflects the "presumption in favor of disclosure [of
litigants' identities], which stems from the 'general public interest in the openness of
governmental processes,' and, more specifically, from the tradition of open judicial
proceedings."  In re Sealed Case, 931 F.3d 92, 96 (D.C. Cir. 2019) (quoting Wash. Legal
Found. v. U.S. Sentencing Comm'n, 89 F.3d 897, 899 (D.C. Cir. 1996)).  A party moving to
proceed pseudonymously thus "bears the weighty burden of both demonstrating a concrete need
for such secrecy[] and identifying the consequences that would likely befall it if forced to
proceed in its own name."  In re Sealed Case, 971 F.3d 324, 326 (D.C. Cir. 2020).  As a result,
the court must "'balance the litigant's legitimate interest in anonymity against countervailing
interests in full disclosure'" by applying a "flexible and fact driven" balancing test.  Id. (quoting
In re Sealed Case, 931 F.3d at 96).  That test assesses "five non-exhaustive factors":

> (1) whether the justification asserted by the requesting party is
> merely to avoid the annoyance and criticism that may attend any
> litigation or is to preserve privacy in a matter of [a] sensitive and
> highly personal nature;
> (2) whether identification poses a risk of retaliatory physical or
> mental harm to the requesting party or[,] even more critically, to
> innocent non-parties;
> (3) the ages of the persons whose privacy interests are sought to be
> protected;
> (4) whether the action is against a governmental or private party;
> and relatedly,
> (5) the risk of unfairness to the opposing party from allowing an
> action against it to proceed anonymously.

Id. at 326–27 (quoting In re Sealed Case, 931 F.3d at 97) (first alteration in original).

## II.    Analysis

At this stage, Petitioners have succeeded in showing that their privacy and safety concerns outweigh the public's presumptive and substantial interest in learning their identities.

The first factor supports granting the Motion. Petitioners do not seek to proceed under pseudonyms "merely to avoid the annoyance and criticism that may attend any litigation," but to "preserve privacy in a matter of [a] sensitive and highly personal nature." Id. at 326 (quoting In re Sealed Case, 931 F.3d at 97) (alteration in original). For instance, several Petitioners allege that the Amended Complaint contains details of their asylum claims, such as the abuse and danger that they faced in Venezuela at the hands of political leaders or paramilitary groups. See Mot. at 4–5. That information is confidential; as Petitioners note, federal immigration regulations "provide for the confidentiality of asylum applicants," and administrative and judicial proceedings stemming from asylum applications routinely use pseudonyms. See id. at 6–7 (citing cases). This factor thus supports pseudonymity. See M.A. v. Mayorkas, 2023 WL 5321924, at *2 (D.D.C. July 6, 2023) (finding similarly for asylum seekers challenging removal policies).

The second factor tips the same way, as Petitioners and their next friends clearly seek to avoid "retaliatory physical or mental harm." In re Sealed Case, 971 F.3d at 326 (quoting In re Sealed Case, 931 F.3d 97). Given the claims in the asylum applications, public identification of these individuals could subject them or their families to retaliatory violence or persecution. See Mot. at 4–5; see also Anim v. Mukasey, 535 F.3d 243, 253 (4th Cir. 2008) ("As DHS recognizes, the confidentiality regulations are of utmost importance in protecting asylum applicants because the regulations safeguard information that, if disclosed publicly, could subject the claimant to retaliatory measures by government authorities or non-state actors in the event

that the claimant is repatriated, or endanger the security of the claimant's family members who may still be residing in the country of origin.") (quotation marks omitted). Petitioners also argue that they could face retaliatory violence in their respective detention facilities if it came to light that they had been labeled members of Tren de Aragua or were contesting that designation. See Mot. at 7. These concerns are as troubling as those that typically justify pseudonymity, see, e.g., J.K.A. v. United States, No. 23-2273, ECF No. 7 (Mem. Op.) at 3–4 (D.D.C. Aug. 10, 2023) (second factor favors pseudonymity when plaintiffs experienced or witnessed abuse by, and faced further "threats of retaliation" from, foreign government); Doe v. U.S. Dep't of State, 2015 WL 9647660, at *3 (D.D.C. Nov. 3, 2015) (permitting pseudonymity to protect plaintiff from retaliation by anti-U.S. insurgents), and they are sufficient here to tip the second factor in Petitioners' favor. See also Doe v. Austin, 2024 WL 864197, at *3 (D.D.C. Feb. 29, 2024) (first two factors favor pseudonymity where plaintiff was "a covert U.S. intelligence officer" and publicity could "draw the attention of hostile . . . actors").

Petitioners do not address the third factor — "the ages of the persons whose privacy interests are sought to be protected," In re Sealed Case, 971 F.3d at 326 (quoting In re Sealed Case, 931 F.3d at 97) — so the Court will assume that it weighs against pseudonymity. There is, in any event, no indication that the Petitioners or their next friends are minors.

The fourth factor weighs slightly against pseudonymity as well. Typically, "anonymous litigation is more acceptable when" (as here) "the defendant is a governmental body because government defendants 'do not share the concerns about "reputation" that private individuals have when they are publicly charged with wrongdoing.'" J.W. v. Dist. of Columbia, 318 F.R.D. 196, 201 (D.D.C. 2016) (quoting Doe v. Cabrera, 307 F.R.D. 1, 8 (D.D.C. 2014)); see also Doe 1 v. George Wash. Univ., 369 F. Supp. 3d 49, 66 (D.D.C. 2019) (same). Analysis of this factor,

however, also involves evaluating whether Petitioners request individual relief. See, e.g., Doe v.

Blinken, No. 24-1629, ECF No. 3 (Mem. Op.) at 5 (D.D.C. June 11, 2024) ("When a plaintiff

requests individualized relief against a government defendant — as here, where Doe challenges a

yearlong delay in adjudicating his SIV application — the fourth factor favors pseudonymity.")

(citation omitted); Doe v. ICE, No. 24-617, ECF No. 9 (Mem. Op.) at 5 (D.D.C. Mar. 8, 2024)

(factor supported pseudonymity where "[p]laintiff allege[d] deficiencies in ICE's compliance

with FOIA solely with respect to his individual request"). Petitioners here seek class-wide relief

invalidating the invocation of the Alien Enemies Act against them and other class members, see

Am. Compl. at 36–37 — assertedly not individualized relief. See In re Sealed Case, 971 F.3d at

329 (where "the party asking to proceed anonymously seeks to alter the operation of public law

both as applied to it and, by virtue of the legal arguments presented, to other parties going

forward," the "public interest is intensified"). This factor thus tips in favor of disclosure.

Fifth and finally, the Government would suffer no "risk of unfairness" if the Motion were

granted. In re Sealed Case, 971 F.3d at 327 (quoting In re Sealed Case, 931 F.3d at 97). As

Petitioners note, Respondents "will know Petitioners' and Next Friends' true identities." Mot. at

8. In such circumstances, this factor does not require disclosure. See In re Sealed Case, 971 F.3d

at 326 n.1 (explaining that this factor is "not implicated" where defendant knows plaintiff's

identity); Doe v. ICE, No. 24-617, Mem. Op. at 5 (fifth factor supports motion where defendant

already knows plaintiff's identity).

In sum, the first, second, and fifth factors weigh in favor of granting the Motion to

proceed pseudonymously. That tally resolves the matter in Petitioners' favor and accords with

this Court's prior grant of the original named Plaintiffs' request for pseudonymity. See First

Minute Order of Mar. 15, 2025.

The Court accordingly ORDERS that:

1. Petitioners' [113] Motion for Leave to File Under Pseudonym is GRANTED;

2. All parties shall use the pseudonyms listed in the Amended Complaint in all

   documents filed in this action; and

3. Within fourteen days of this Order, Petitioners and their next friends must file a sealed

   declaration containing their real names and residential addresses.

/s/ <em>James E. Boasberg</em><br>
JAMES E. BOASBERG<br>
Chief Judge

Date: <u>May 8, 2025</u>

EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIYANARA SANCHEZ, as next friend on behalf of
FRENGEL REYES MOTA, *et al.*,

*Petitioners–Plaintiffs*,

J.G.G., *et al.*,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as
President of the United States, *et al.*,

*Respondents–Defendants*.

Case No: 1:25-cv-00766-JEB

### PETITIONERS-PLAINTIFFS' SUPPLEMENTAL MOTION FOR LEAVE TO PROCEED UNDER PSEUDONYMS[1]

Petitioners-Plaintiffs and Next Friends M.Z.V.V., J.A.B.V., M.Y.O.R., M.A.O.R.,

M.M.A.A., G.A.A.A., M.R.M., and T.C.I. move for permission to proceed under pseudonyms in

the above-captioned case. The named Petitioners and Next Friends are challenging the

Presidential Proclamation entitled the "Invocation of the Alien Enemies Act Regarding the

Invasion of The United States by Tren De Aragua" and its implementation. They do so in a time

of extreme anti-immigrant rhetoric and hostility.  The individuals seeking to proceed under

pseudonym here fall into three categories: (1) next friends, suing on behalf of their family

members detained at the Centro del Confinamiento del Terrorismo ("CECOT") in El Salvador;

---

[1] Pursuant to Local Civil Rule 7(m), Plaintiffs' counsel conferred with the government. The
government takes no position on this motion.

(2) Petitioners detained at CECOT; and (3) a Petitioner detained in criminal custody in the United States.

This Court previously permitted the original named Plaintiffs—J.G.G., G.F.F., J.G.O., W.G.H., and J.A.V.—to proceed under pseudonyms. March 15, 2025, Minute Order (Plaintiffs "shall be permitted to proceed pseudonymously"). Other courts to consider similar motions in other AEA cases have also granted them. *See, e.g.* Order Granting Petitioners' Motion for Leave to Proceed Under Pseudonyms, *G.F.F. v. Trump*, No. 1:25-cv-2886 (S.D.N.Y. Apr. 8, 2025), ECF No. 10; Order, *D.B.U. v. Trump*. No. 1:25-cv-1163 (D. Colo. Apr. 14, 2025), ECF No. 11; Order of Court, *A.S.R. v. Trump*, No. 3:25-cv-115 (W.D. Pa. Apr. 15, 2025), ECF No. 9; Order, *W.M.M. v. Trump*, No. 1:25-cv-59 (N.D. Tex. Apr. 16, 2025), ECF No. 9; April 24, 2025 Minute Order, *J.A.V. v. Trump*, No. 1:25-cv-72 (S.D. Tex. Apr. 24, 2025). Petitioners ask this Court to grant anonymity to the new Petitioners and Next Friends because the amended complaint, declarations, and subsequent filings will contain highly sensitive and personal information about their immigration status and history. Moreover, individuals detained at CECOT face retributive violence should it come to light that they are challenging their confinement there. Respondents will not be prejudiced in their ability to litigate the legality of the Proclamation, and the public's interest in knowing the identities of the Petitioners and Next Friends is minimal. Petitioners and Next Friends are willing to provide the Court with their names. Thus, this Court should protect the Petitioners' and Next Friends' safety and liberty interests and grant the Motion.

**I.      The Use of Pseudonyms Is Justified Here.**

While the general rule is that complaints state the names of the parties, *see* Fed. R. Civ. P. 10(1), this Court has the discretion to allow a plaintiff to proceed anonymously. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1464 (D.C. Cir. 1995). Courts may permit the use of

pseudonyms when "the impact of the plaintiff's anonymity" outweighs "the public interest in

open proceedings and on fairness to the defendant." *Chao*, 587 F. Supp. 2d at 99; *see also Qualls*

*v. Rumsfeld*, 228 F.R.D. 8, 10 (D.D.C. 2005). At the time of filing, Petitioners need only make a

"colorable argument in support of the request." *Qualls*, 228 F.R.D. at 10. Courts examine: (1)

whether Petitioners' request is intended "to preserve privacy in a matter of a sensitive and

highly personal nature"; (2) whether the petitioner has a reasonable expectation of "physical or

mental harm"; (3) whether the petitioner is a minor; (4) whether the defendant is the government;

and (5) the type of prejudice the defendant might experience if the petitioner proceeds

anonymously. *Chao*, 587 F. Supp. 2d at 99; *see also United States v. Hubbard*, 650 F.2d 293,

317–21 (D.C. Cir. 1980) (setting forth a balancing test that considers, inter alia, "the strength of

the . . . property and privacy interests" involved with the "possibility of prejudice" to those

opposing disclosure). Courts in this District have exercised broad discretion to "allow plaintiffs

to proceed under a pseudonym in cases involving matters of a sensitive and highly personal

nature." *Doe v. Cabrera*, 307 F.R.D. 1, 4 (D.D.C. 2014) (citing *Chao*, 587 F. Supp. 2d at 99); *see*

*also Yaman v. U.S. Dep't of State*, 786 F. Supp. 2d 148, 152–53 (D.D.C. 2011); *Doe v. Von*

*Eschenbach*, No. 06–2131, 2007 WL 1848013, at *2 (D.D.C. June 27, 2007).

      Here, Petitioners' claims are sensitive and highly personal. Many Petitioners and Next

Friends are asylum seekers who face significant risk of persecution—including possible physical

harm or death—if their identities are publicly revealed through this lawsuit. Moreover, many

Petitioners are currently detained at CECOT, where they face persecution and torture from their

captors for their involvement in this lawsuit. Finally, individuals who are publicly alleged by the

U.S. government to be Tren de Aragua members face a real risk of serious harm if they are

returned to Venezuela based on these unsubstantiated allegations. Similarly, Next Friends—who

currently live in Venezuela—also face serious harm by virtue of being family members of

Petitioners alleged to be affiliated with Tren de Aragua. Moreover, each of the Respondents is a

government agency or official sued in an official capacity, and Respondents will experience no

prejudice from allowing Petitioners and Next Friends to proceed pseudonymously. In light of the

extreme sensitivities of Petitioners' and Next Friends' case and the potential danger posed to

Petitioners and their families, the public interest does not require the use of their full names. In

short, the relevant factors in this case weigh heavily in favor of allowing Petitioners and Next

Friends to proceed under pseudonyms. *See Chao*, 587 F. Supp. 2d at 99.

### A. Petitioners' Claims Are Sensitive and Highly Personal, and Public Disclosure Could Result in Physical or Mental Harm to Petitioners, Next Friends, and Their Families.

Petitioners and Next Friends seek to proceed under pseudonyms to protect their privacy

and safety, as well as the safety of family members who remain in their countries of origin.

While the public typically has an interest in "knowing the facts surrounding judicial

proceedings," this case is one in which anonymity is necessary "to preserve privacy in a matter

of a sensitive and highly personal nature" and to protect Petitioners and Next Friends from

possible future harm. *Doe v. Von Eschenbach*, 2007 WL 1848013, at *1–2 (D.D.C. June 27,

2007).

Both Petitioners and Next Friends have highly sensitive and personal reasons for

remaining under pseudonym:

<u>Petitioners (J.A.B.V., M.A.O.R., G.A.A.A., M.R.M., T.C.I.)</u>: Petitioners have several

independent reasons to proceed pseudonymously.

*First*, the amended complaint contains sensitive, personal information, including details

of their asylum claims. For example, J.A.B.V. fled Venezuela after he campaigned for the

opposition leader, and was subsequently abducted by masked men, beaten, and told he would be

killed if he campaigned again. Similarly, G.A.A.A. fled Venezuela and sought asylum in the

United States due to violence in his hometown at the hand of a paramilitary group. Given these

dangers, Petitioners face further risk of harm if their identities were disclosed publicly. They fled

their countries of origin because they were persecuted and/or feared persecution if they

remained. As asylum seekers fleeing danger, they fall within a particularly vulnerable class of

migrants for whom confidentiality about the nature and existence of their claims is particularly

important, as their "identification [could] create[] a risk of retaliatory physical or mental harm."

*Qualls*, 228 F.R.D. at 10-11 (internal quotation marks and citation omitted); *see also* U.N. High

Comm'r for Refugees, Advisory Opinion on the Rules of Confidentiality Regarding Asylum

Information ("UNHCR Advisory Opinion") (Mar. 31, 2005) at 2-3[2] ("[P]rivacy and its

confidentiality requirements are especially important for an asylum-seeker, whose claim

inherently supposes a fear of persecution by the authorities of the country of origin and whose

situation can be jeopardized if protection of information is not ensured."). Indeed, if Petitioners'

persecutors learned of their asylum claims, this lawsuit, or the circumstances of Petitioners'

immigration to the United States, it could leave them in significant danger.

    Petitioners also face further harm if the U.S. government publicly identifies them as Tren

de Aragua members, without evidence, as part of this lawsuit. This harm is irreparable: once

these allegations about Petitioners are made public, they "could not be made secret again."

*Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317 (1983) (Blackmun, J., denying application

for stay); *Senior Executives Ass'n v. United States*, 891 F. Supp. 2d 745, 755 (D. Md. 2012)

(recognizing that disclosure of information "is a bell that one cannot unring").

    The federal immigration regulations reflect this concern for the sensitivity of asylum

---

[2] *Available at* http://www.refworld.org/docid/42b9190e4.html.

applications and the attendant need for confidentiality. Asylum regulations provide for the

confidentiality of asylum applicants and credible fear interviewees, including the fact that an

applicant has applied for asylum or received a credible fear interview. *See* 8 C.F.R. §§ 208.6,

1208.6. The Department of Homeland Security has acknowledged the importance of these

regulations to the future safety of asylum applicants. *See Anim v. Mukasey*, 535 F.3d 243, 253

(4th Cir. 2008) ("As DHS recognizes, the confidentiality regulations are of utmost importance in

protecting asylum applicants because the 'regulations safeguard information that, if disclosed

publicly, could subject the claimant to retaliatory measures by government authorities or non-

state actors in the event that the claimant is repatriated, or endanger the security of the claimant's

family members who may still be residing in the country of origin.'") (quoting U.S. Citizenship

& Immig. Serv. Asylum Div., U.S. Dep't of Homeland Sec., *Fact Sheet: Fed. Regulations

Protecting the Confidentiality of Asylum Applicants* (2005)). For the same reasons, when the

Board of Immigration Appeals issues published asylum-related decisions, it routinely uses only

the initials of the applicant. *See, e.g.*, *Matter of M-H-Z-*, 26 I. & N. Dec. 757 (B.I.A. 2016).

        In recognition of the powerful interest that asylum seekers possess in maintaining their

confidentiality, numerous courts have allowed them to proceed with pseudonyms or initials. *See,

e.g.*, *M.A. v. Mayorkas*, No. CV 23-1843, 2023 WL 5321924 (D.D.C. July 6, 2023); *Las

Americas Immigrant Advocacy Center v. DHS*, No. 24-CV-1702, Dkt. 60 (D.D.C. Nov. 18,

2024); *Nora v. Wolf*, No. 1:20-CV-00993, 2020 WL 12956896, at \*2 (D.D.C. Apr. 16, 2020);

*O.A. v. Trump*, No. 18-cv-2718, 2019 WL 3536334 (D.D.C. Aug. 2, 2019), ECF No. 3; *N.L.A. v.

Holder*, 744 F.3d 425, 428 n.1 (7th Cir. 2014); *Doe v. Holder*, 736 F.3d 871, 872 n.1 (9th Cir.

2013); *Doe v. Holder*, 651 F.3d 824, 826 (8th Cir. 2011); *Al Otro Lado, Inc. v. Nielsen*, 2017 WL

6541446, at \*8 (S.D. Cal. Dec. 20, 2017); *M.M.M. v. Sessions*, No. 18-1759-BAH (D.D.C. July

27, 2018), ECF No. 2; *M.G.U. v. DHS*, No. 18-cv-1458-BAH (D.D.C. June 21, 2018); *Ms. L. v.*
*ICE*, No. 18-428 (S.D. Cal. Mar. 6, 2018), ECF No. 26.

    *Second*, Petitioners detained at CECOT have legitimate reason to fear that, should their
information become public, and should it come to light that they are challenging their detention,
they would likely become victims of retributive violence at CECOT. Retributive violence is a
regular occurrence at CECOT, *see* Bishop Decl. ¶¶ 2, 210, ECF No. 102-5, and such a high-
profile challenge to their detention would almost certainly incur consequences for Petitioners.
Being named in a public CBS list does not alter the analysis, as the government of El Salvador
has no way of knowing which specific individuals who wish to remain anonymous are
challenging their detention there, and the general nature of the list does not link any particular
anonymous Petitioner to a known person detained at CECOT.

    *Third*, Petitioner, who is in federal criminal custody, also has legitimate reason to fear
that public disclosure of his name could expose him or his family to retaliation, or subject him to
retributive treatment while in detention. Detention staff have already pressured him to sign a
paper falsely asserting that he was a member of Tren de Aragua. He fears being falsely labeled as
a member of Tren de Aragua would increase the risk of target mistreatment while in U.S.
custody, and, if removed to Venezuela, would place him at serious risk of harm. *See* Hanson
Decl. ¶ 28, ECF No. 102-2. He also fears removal to CECOT, where individuals accused of
being affiliated with Tren de Aragua have been subjected to abusive and inhumane conditions.

    <u>Next Friends (M.Z.V.V., M.Y.O.R., M.M.A.A.):</u> Next Friends also have legitimate
reasons to proceed pseudonymously. Next Friends—all of whom reside in Venezuela—face
serious risk of harm if their identities are disclosed, simply because they are close family
members of individuals falsely alleged to be members of Tren de Aragua. Given the gang's

notoriety and the Venezuelan government's harsh treatment of those even suspected of

association with the gang, disclosing Next Friends' identities could subject them to surveillance,

harassment, and physical harm. *See* Hanson Decl. ¶ 28, ECF No. 102-2. Indeed, courts in this

District have routinely permitted next friends to proceed under pseudonyms. *See McCutchen v.*

*Becerra*, No. 1:21-CV-01112, 2021 WL 1718806, at *4 (D.D.C. Apr. 23, 2021) (permitting

plaintiffs and their next friends to proceed under pseudonym); *M.J. v. D.C.*, No. 1:18-CV-01901,

2018 WL 11491159, at *4 (D.D.C. Aug. 14, 2018) (same); *Asylumworks v. Wolf*, No. NO. 1:20-

CV-03815, 2020 WL 13460835, at *4 (D.D.C. Dec. 23, 2020) (granting next friend's motion to

proceed under pseudonym).

### B. Respondents Are Government Officials Who Will Not Be Prejudiced, and The Public Interest Will Be Served

Allowing Petitioners and Next Friends to proceed pseudonymously is especially

appropriate where, as here, Respondents are government officials sued in their official capacity.

*See, e.g.*, *Chao*, 587 F. Supp. 2d at 99 n.9 ("[W]hen a plaintiff challenges the government or

government activity, courts are more like[ly] to permit plaintiffs to proceed under a pseudonym

than if an individual has been accused publicly of wrongdoing." (citing *Yacovelli v. Moeser*,

2004 WL 1144183, at *8 (M.D.N.C. May 20, 2004))).

Moreover, Respondents will suffer no prejudice should Petitioners and Next Friends be

allowed to proceed under pseudonym. Because Respondents will know Petitioners' and Next

Friends' true identities, allowing them to proceed pseudonymously would pose no "risk of

unfairness to the opposing party." *Chao*, 587 F. Supp. 2d at 99; *see also Al Otro Lado*, 2017 WL

6541446, at *6 (finding no prejudice to government defendants who "know the Individual

Plaintiffs' names" and "have the information they need to defend against the claims").

Additionally, any public interest in disclosing Petitioners' and Next Friends' identities is greatly

outweighed by the significant risk of harm that such disclosure would pose to them. Finally,

forcing Petitioners and Next Friends to expose their identities, including to their persecutors, to

pursue litigation "creates an unnecessary risk of chilling the willingness of asylum seekers from

litigating important issues like the ones raised in this case." *Al Otro Lado*, 2017 WL 6541446, at

*7. Thus, permitting Petitioners and Next Friends to use pseudonyms "will serve the public's

interest in this lawsuit by enabling it to go forward." *Does I thru XXIII v. Advanced Textile

Corp.*, 214 F.3d 1058, 1073 (9th Cir. 2000).

## CONCLUSION

For the foregoing reasons, Petitioners and Next Friends should be permitted to proceed in

this suit under their proposed pseudonyms.

Dated: May 6, 2025

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo (D.D.C. Bar No. CA00219)
Cody Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
edanforth-scott@aclu.org
cwang@aclu.org
cwofsy@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
Scott Michelman (D.C. Bar No. 1006945)
Aditi Shah (D.C. Bar No. 90033136)*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF
COLUMBIA

Respectfully submitted,

/s/ *Lee Gelernt*
Lee Gelernt (D.D.C. Bar No. NY0408)
Daniel Galindo (D.D.C. Bar No. NY035)
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi (D.D.C. Bar No. MI0071)
Michael K.T. Tan*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org
m.tan@aclu.org

529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org
ashah@acludc.org


*Attorneys for Petitioners-Plaintiffs*
*\*Admission to DDC Bar pending*

Somil B. Trivedi (D.C. Bar No. 1617967)
Bradley Girard (D.C. Bar No. 1033743)
Michael Waldman (D.C. Bar No. 414646)
Sarah Rich
Skye Perryman (D.C. Bar No. 984573)
Audrey Wiggins (DC Bar No. 482877)
Christine L. Coogle (DC Bar No. 1738913)
Pooja Boisture
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
Fax: (202) 796-4426
strivedi@democracyforward.org
bgirard@democracyforward.org
mwaldman@democracyforward.org
srich@democracyforward.org
sperryman@democracyforward.org
awiggins@democracyforward.org
ccoogle@democracyforward.org
pboisture@democracyforward.org

EXHIBIT 3

# EXHIBIT G

**DECLARATION OF D.A.R.H.**

I, D.A.R.H., declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am 65 years old and currently reside in Capacho Nuevo, Tachira, Venezuela. I am the mother of Andry Jose Hernandez Romero, a 31-year-old Venezuelan citizen. Andry has always been close to his father and me. He lived in our home until he moved out to pursue a career as a professional make-up artist. Even then, he stayed in constant communication with us and would often visit us. When he decided to leave Venezuela to seek protection in the U.S., he stayed in communication with me throughout his journey to let me know about his location and that he was safe.

2. I am submitting this declaration because I am deeply worried about my son's safety. Andry was in the middle of seeking asylum in the United States when he was taken without warning, sent to another country, and cut off from everyone. I am doing everything I can to find him and support him. I have been in contact with international human rights groups to help find him. I have also stayed in contact with his immigration attorney, Paulina Reyes, to get updates on his case and to ensure she has all the information necessary to continue his case. Since he is now unable to speak for himself or advocate for his rights, I wish to do so on his behalf.

3. Andry is a kind, humble, hardworking person. He is openly gay and worked in Venezuela as a makeup artist at a government-affiliated television station. He was targeted for both his sexual orientation and his refusal to promote government propaganda. He told me that his supervisors pressured him to post content supporting the Maduro regime and threatened him when he wouldn't comply. Around the same time, he said armed men connected to the government, called *colectivos*, started following him and threatening him too.

4. In fear for his life, Andry quit his job, went into hiding, and then left Venezuela in May 2024. He told me used the CBP One app to present himself at the San Ysidro Port of Entry in August 2024, where he was taken into immigration custody. Later, he said he was transferred to a detention center in California.

5. Andry passed a credible fear interview and was placed into full immigration court proceedings. He told me he had found a lawyer who was helping him apply for asylum, withholding of removal, and CAT protection and submit evidence in support of his case. I stayed in regular contact with him and supported him as best as I could from here. I helped gather documents that the lawyer needed for his case and gave them to a friend of his who would send copies over e-mail.

6. One day, he told me that the U.S. government was accusing him of being part of a gang called *Tren de Aragua*. This is completely false. Andry has never been involved in any gang. He has no criminal record.

7. The only "evidence" I am aware of is that he has two tattoos, crowns next to the words "Mom" and "Dad." These have nothing to do with a gang. In our hometown, there is a cultural festival for the Three Wise Men that happens every year in early January, and Andry has participated in it since he was a seven-year-old child. He got those tattoos several years ago as a way of honoring the festival and theatre troupe "Fundacion Reyes Magos de Capacho" (Wise Men Foundation of Capacho) that acted in the festival. Most of the members of that theatre troupe also have crown tattoos and like to promote this event. He also worked with beauty pageants and often posted photos with pageant crowns as props. This is who he is—an artist, not a criminal.

8. In early March 2025, Andry was moved from California to a different detention center in Texas. The last time I heard from Andry was on March 14, 2025. Andry called to tell me that he was going to be transferred to another location because they told him that he was going to be sent to Venezuela.

9.

10. After that, no one knew where he was. His lawyer tried to find him. She asked the detention center, ICE, and the government attorney handling his court case. For days, no one gave any information. Then, on March 17, during a scheduled immigration hearing, the government attorney said Andry was "no longer in ICE custody" and had been removed from the United States to El Salvador. We confirmed it when his name appeared in a news report listing Venezuelans deported to El Salvador.

11. I have not heard from Andry since then. His lawyer has also said there is no way for her to speak with him or for him to appear at his next hearing. It is like he disappeared. On April 24, 2025, Andry's immigration attorney, Paulina Reyes, informed me that she called ICE's Enforcement and Removal Operations Detention, Reporting and Information Line (DRIL) at 1-888-351-4024 to request information about my son, who is detained at CECOT, and to speak with him. ICE did not have any information about his current location, they were only able to confirm that he was removed from the country.

12. I am terrified for my son's safety. I have read about the prison in El Salvador, where the government is sending people without a hearing. I do not know how he is being treated, what conditions he is in, or even if he is alive. As a gay man and someone falsely accused of gang activity, I fear that he is in danger every day. A photojournalist published photos about people who were sent to CECOT, and we were able to confirm that Andry was there and was being mistreated by the guards and begging for his release.

13. Andry had a future in the United States. He had filed for asylum and never had the chance to defend himself in court or to respond to the false accusations against him. He was in the middle of a legal process that had not finished. No judge ever ordered him removed.

14. As his mother, I am devoted to Andry's best interests. I have known him every day of his life. I supported him before and after he fled Venezuela, and throughout his time in the United States. I have continued to do everything I can to support him since his removal — including speaking with his lawyer and trying to find any information about where he

is. I want to make sure that his voice is not lost just because he has been taken from the country. I want to speak for him until he is able to speak for himself again.

15. I believe it is in Andry's best interest to be allowed to participate as a named petitioner in this case. I know that he would want to challenge his removal under the Alien Enemies Act. He was never given the chance to defend himself before being taken away, and I know he would want the opportunity to clear his name and continue his legal case in the United States.

16. I respectfully ask that my son be allowed to return to the United States so that he can pursue his asylum claim, be reunited with his attorney, and have a real opportunity to seek the protection he came to the United States for.

Executed this 22 day of April, 2025, in Tachira, Venezuela.



Mother of Andry Jose Hernandez Romero

EXHIBIT 4

# EXHIBIT H

### DECLARATION OF M.Z.V.V.

I, M.Z.V.V., declare under penalty of perjury as follows:

1.  My name is M.Z.V.V. I am a citizen and resident of Venezuela. I am the mother of J.A.B.V., a 24-year-old Venezuelan national.

2.  J.A.B.V. is my youngest son, and we have always been very close. He is affectionate, caring, and kind. I raised him since birth, and we lived together until he left Venezuela. We have had a strong, supportive relationship throughout his life. I helped pay for all his daily expense when he was in Venezuela. I am extremely worried for his safety, and I have had difficulty sleeping or eating since I learned that he had been deported to El Salvador. Not knowing what has happened to him has caused me immense distress.

3.  J.A.B.V. fled Venezuela in February 2024 after being violently targeted for his political beliefs. He was a supporter of opposition leader Maria Corina Machado and actively participated in campaign activities. In January 2024, while distributing campaign materials, he was abducted by masked men in a black SUV, beaten, and told he would be killed if he campaigned again. J.A.B.V. told me his captors threatened him, stating, "Today we spare your life, but if you campaign again, there will be no forgiveness next time." He was then held for several days at the Los Proceres police center, where he was tortured, denied food, and threatened repeatedly. His captors repeatedly told him he was a "traitor to the homeland" and that if he was found again, he would be executed.

4.  After being released, J.A.B.V. fled Venezuela, traveling through Colombia and Central America. J.A.B.V.'s immigration attorney, Osvaldo Caro-Cruz, informed me of J.A.B.V.'s immigration processes and records. J.A.B.V. entered the United States in August 2024 through a CBP One appointment at the San Ysidro port of entry. He passed a credible fear interview and filed for asylum on November 7, 2024. His immigration case was pending, and he did not have a final order of removal at the time of his deportation.

5.  J.A.B.V. remained detained in ICE custody from the moment he entered the U.S. in August 2024 until he was removed in March 2025. Mr. Caro-Cruz informed me that although J.A.B.V. passed his credible fear interview, ICE refused to release him due to concerns about his tattoos, which they claimed were gang-related. His Record of Deportable/Inadmissible Alien (Form I-213) states he had no prior criminal history in the US, that he was a citizen of Venezuela, and that he was fleeing the country because he feared for his life. The same document states: "Subject has gang-related tattoos which were photographed by CBPO Clesi. The tattoos are well-known tattoos that Tren de Aragua gang members tend to have. Subject denied being part of Tren de Aragua or any other gang." J.A.B.V. was never charged with any crime and never received a clear explanation for why he remained in custody.

6.  J.A.B.V. has several tattoos on his arm and ribcage, including a rose, a clock with my name and his father's name, an angel, and a crown with his son's name. These tattoos

reflect his love for his family. They are not gang-related. J.A.B.V. has never been a member of any gang, including Tren de Aragua.

7. J.A.B.V. has no criminal record in Venezuela or the United States. His I-213 immigration paperwork states that he has no criminal history. He is not a dangerous person. He is a peaceful, respectful, and hardworking young man.

8. On or around March 15, 2025, I learned that J.A.B.V. had been deported from the United States. His attorney was not notified, and neither was our family. He had an immigration court hearing scheduled for April 2025 and was still in active removal proceedings. He never had the opportunity to appear in court or present his asylum case.

9. A few days later, I saw J.A.B.V.'s name on a public list of Venezuelans who had been deported to El Salvador. I was shocked and devastated. We were never given any information by the U.S. government about where he had been sent.

10. J.A.B.V. was deported to El Salvador and is now being held at the Terrorism Confinement Center (CECOT), a prison known for inhumane conditions. I have not been able to speak with him directly since his removal. Neither I nor his attorney has received any meaningful information about his whereabouts or well-being. I am terrified for his safety.

11. On April 24, 2025, Mr. Caro-Cruz, on my behalf, called ICE's Enforcement and Removal Operations Detention, Reporting and Information Line (DRIL) at 1-888-351-4024 to request information about my son, who is detained at CECOT, and to speak with him. ICE refused to answer his questions and stated that they could not allow him or me to speak with my son.

12. J.A.B.V.'s deportation has caused me enormous pain and fear. He is my little boy, and I raised him with love and care. He should never have been sent to a foreign prison without due process or a chance to defend himself.

13. As his mother, I am committed to advocating for J.A.B.V. and representing his best interests while he remains detained and unable to speak for himself. I am willing to serve as his next friend in this case and do everything I can to support him. He is a person of integrity and deserves the chance to continue his asylum case and clear his name.

14. I believe it is in J.A.B.V.'s best interest to participate as a named petitioner in this case and to have the opportunity to challenge his removal under the Alien Enemies Act. I know he would want to return to the United States to pursue his asylum claim and defend himself in court. I respectfully ask that my son be allowed to return and be reunited with his family.

Executed on April 24, 2025 in Portuguesa, Venezuela.

M.Z.V.V.

**ATTESTATION AND CERTIFICATE OF TRANSLATION**

I, Talia Roma, certify that I am fluent in both English and Spanish. On April 24, 2025, I

personally spoke with M.Z.V.V. and read the foregoing information to her over the phone.

M.Z.V.V. affirmed that the information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

_____

Talia Roma
Paralegal
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94609
(412) 626-1379
troma@aclu.org

EXHIBIT 5

# EXHIBIT I

**DECLARATION OF M.Y.O.R.**

I, M.Y.O.R., do hereby declare the following under penalty of perjury:

1. I am 34 years old and live in Barquisimeto, Lara State, Venezuela. I am a national of Venezuela. I am the younger sister of M.A.O.R., who is 36 years old. We have lived together for much of our lives and remain very close.

2. I believe that my brother was wrongfully accused of being a member of Tren de Aragua ("TdA") and removed to El Salvador. I saw my brother's name on a list published by news outlets of Venezuelans taken to El Salvador.

3. M.A.O.R. entered the United States around September 2024 through a CBP One appointment. He was in the process of seeking protection in the U.S. and had a hearing scheduled in immigration court on April 22, 2025. To my knowledge, he had no removal order.

4. On or about October 24, 2024, M.A.O.R. was detained by ICE during a raid at his workplace in or around Calexico, California. ICE allegedly targeted the workplace because two employees appeared in a video joking about being members of TdA. My brother and our cousin, Edwin, did not appear in the video, but both were arrested along with two other Venezuelan employees.

5. My brother has never been affiliated with any gang. He has no criminal record in any country and does not have any tattoos. I have known him my entire life and know him to be a hardworking person who devoted his time to supporting himself and our family. He had no reason to be involved in any gang activity.

6. After being detained, my brother was taken to the Imperial Regional Detention Facility in Calexico, California. While detained, immigration officials investigated and told my brother that they had determined that he was not in fact associated with TdA and had confirmed that he has no criminal history.

7. Around March 7, 2025, my brother was transferred to the Rio Grande Processing Center in Laredo, TX.

8. I last spoke with my brother on March 13, 2025. He told me he had been informed that he would be deported to Venezuela. On March 14, 2025, he spoke to a friend and told her that he and other detainees had been taken to an airplane that day, but the flight did not take off due to weather issues. He told her they had been told the deportation would be attempted again soon.

9. On March 15, 2025, I checked the ICE Detainee Locator and found that my brother no longer appeared in the system. That same day, his status on the GO Visits app showed as "liberated" for the first time since I began speaking with him through the app. I initially believed he had been deported to Venezuela. However, the next day, I saw news reports

that Venezuelan detainees had been taken to El Salvador. I was extremely worried. Eventually, a list of individuals transferred to El Salvador was made public, and my brother's name was on that list.

10. At no point did the government give my brother or his attorney a meaningful opportunity to respond to or rebut the allegation of TdA association before he was removed. Nor were we given any notice that he was being designated under the Alien Enemies Act based on that accusation.

11. My brother was sent to the CECOT prison in El Salvador, a facility widely reported to have overcrowded, abusive, and inhumane conditions. I am extremely worried about his health and safety. We have not received any communication from him since his transfer, and my family and I have no way of contacting him or confirming his well-being. We understand there is no way for him to challenge the government's allegations or seek any kind of review while he remains detained there.

12. At the time he was deported, M.A.O.R. was still in active removal proceedings and had not been ordered removed by an immigration judge. He had an upcoming immigration court hearing scheduled for April 22, 2025, but he was unable to appear because he had already been removed from the country. An attorney who works for a non-profit attended the hearing on April 22, and let me know that his court date was rescheduled for May 20, 2025.

13. On April 24, 2025, I called ICE's Enforcement and Removal Operations Detention, Reporting and Information Line (DRIL) at 1-888-351-4024 to request information about my brother, who is detained at CECOT, and to speak with him. ICE refused to directly answer my questions about his whereabouts and my request to speak with him and instead noted that he was no longer in ICE custody.

14. As his sister, I am dedicated to my brother's well-being and committed to representing him while he remains detained in a foreign prison and is unable to speak for himself. I believe it is in M.A.O.R.'s best interest to participate as a named petitioner in this case and to have the opportunity to challenge his removal under the Alien Enemies Act.

15. I respectfully ask that my brother be allowed to return to the United States to continue pursuing his asylum case and be reunited with his family.


Executed on this 24 day of April 2025


_____

M.Y.O.R.

## CERTIFICATE OF TRANSLATION

I, Talia Roma, certify that I am fluent in both English and Spanish. On April 24, 2025, I

personally spoke with M.Y.O.R. and read the foregoing declaration to her, translated into Spanish

faithfully and accurately, over the phone. M.Y.O.R. affirmed that she understood my translation

and that the information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.


_____
Talia Roma
Paralegal
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94609
(412) 626-1379
troma@aclu.org

EXHIBIT **6**

# EXHIBIT J

### DECLARATION OF M.M.A.A.

I, M.M.A.A., hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

1. I make this declaration based on my own personal knowledge, and if called to testify, I could and would do so competently and truthfully to these matters.

2. I currently live in Tachira, Venezuela and I am the mother of G.A.A.

3. I am submitting this declaration because my son's name is on the public list of people who were deported to El Salvador under the Alien Enemies Act. My son had an open asylum case in the United States and no deportation order. I also believe my son was accused of being associated with the Tren de Aragua gang, with which he has no affiliation whatsoever.

4. G.A.A. and his partner entered the United States in December of 2023 through a CBPOne appointment at the border. G.A.A. came to the U.S. to seek asylum. We are from the state of Tachira, VZ where the area is run by a paramilitary group. Due to the violence in our town at the hands of this group, my son fled. He came to the United States to seek a better, safer life for his family, and never expected to be met with such injustice.

5. In December 2024, G.A.A. submitted his application for asylum and was scheduled to appear for a master calendar hearing on October 1, 2025. While he was in the United States waiting for his asylum claims to be heard, he and his wife settled in Louisville, Texas and in June 2024, they gave birth to a baby boy.

6. On February 4, 2025, G.A.A. was in the driveway of his own home, working on fixing his car when he felt someone touch his foot and ask him to please stand up and answer some questions. It was an ICE officer who had arrived at the apartment with a picture of an individual they were looking for, an individual G.A.A. knew nothing about. The ICE officers informed G.A.A. and his wife that they were going to enter the apartment and search for this man. After they investigated the apartment and found no sign of the man they were searching for, they asked G.A.A. to take off his jacket so that they could inspect him. When they saw the tattoos on his arms, they informed G.A.A. and his wife that they were going to apprehend him and inspect him further. They provided G.A.A. and his wife no further explanation.

7. Once ICE officers had G.A.A. detained at a detention center, his wife tried calling to figure out what was going on. She was informed that the investigation was ongoing, and "just routine" and that once it ends, he would be released.

8. At the detention center, G.A.A. was told that because of his tattoos he was being investigated as a possible gang member. G.A.A. has five tattoos, and none of them have any relation to gang activity. In Venezuela, tattoos are very common, and people do not get them in association with a gang. On his neck he has a crown with the name 'Santiago', that he got in honor of his eldest son, Santiago. On his right shoulder he has a

star and on his left shoulder he as an infinity sign, and on his bicep he has a skull with flowers, all of which he got because he liked them when he was younger. On his forearm, he has tattooed the words "Real Life" which is a reference to a music album.

9. G.A.A. has never had any connection with Tren de Aragua or any other gang. He has no criminal record, he has never been in prison, and his tattoos have nothing to do with any gang affiliation. He is a hard worker, a big support for his family and he would not have any time or desire to be affiliated with a gang.

10. On Friday, March 14, G.A.A. was put on a plane and told that he was being deported to Venezuela. The plane was not able to take off, and he along with the other passengers were returned to the detention center. March 14 was the last time G.A.A. was able to communicate with his family.

11. After this, we learned that my son had been removed to El Salvador on March 15 as his name was included in the list of class plaintiffs detained at CECOT. I am so worried about my son's well-being, and I am deeply concerned for his wife and baby who are still in the United States without his support.

12. On April 23, 2025, with the help of one of my son's friends, I called ICE's Enforcement and Removal Operations Detention, Reporting and Information Line (DRIL) at 1-888-351-4024 to request information about my son, who is detained at CECOT, and to speak with him. ICE told us he was removed and there was no information they could provide.

13. As G.A.A.'s mother, I am dedicated to representing G.A.A.'s best interests and I am committed to representing him while he is in detention in a foreign country and unable to speak for himself. I have known my son since his birth, I raised him, and he always been a good and kind person. He is a very important support for his wife and baby and he cares a lot about his family's well-being. He has never had any involvements with police, or any gangs, and has never gotten into any sort of legal trouble. Ever since my son's unjust deportation and detention in El Salvador, my family and I have been doing everything we can to try and contact ICE officials for more information, to advocate for his safe and prompt release from detention, and to help support him and his best interests through this terrible injustice.

14. I believe it is in G.A.A.'s best interest to participate as a named petitioner in this case and to have the opportunity to challenge the false accusations made against him, including his designation as an "alien enemy" and any claims of TdA affiliation. I know he would want to return to the United States so that he can continue to pursue his asylum claim and be reunited with his young child and partner. I respectfully ask that G.A.A. be allowed to return to the United States to do so.

15. Everything in this declaration is true and correct to the best of my knowledge and recollection. This declaration was read back to me in Spanish, a language in which I am fluent.

Executed on the 24th day of April, 2025 in Tachira, Venezuela.

███████

M.M.A.A.

**ATTESTATION AND CERTIFICATE OF TRANSLATION**

I, Talia Roma, certify that I am fluent in both English and Spanish. On April 24, 2025, I

personally spoke with M.M.A.A. and read the foregoing information to her over the phone. M.M.A.A.

affirmed that the information in the above declaration is true and accurate.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true

and correct.

_____
Talia Roma
Paralegal
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, 7th Floor
San Francisco, CA 94609
(412) 626-1379
troma@aclu.org

EXHIBIT 7

# EXHIBIT K

## DECLARATION OF DORYS MENDOZA
## IN SUPPORT OF M.R.M.

I, Dorys Mendoza, declare the following:

1.      I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently testify to them. I am providing this declaration in support of my son, M.R.M. ("Miguel"), who I believe is currently being held unlawfully in the CECOT prison in El Salvador.

2.      Miguel was born in 1992, in Coro, Venezuela. He entered the United States in May 2023. He lived in Louisiana, worked caring for horses, and was in a committed relationship. He sent remittances to support me. He also provided consistent emotional and financial support to his two children from a prior relationship who live in Venezuela.

3.      Miguel called me almost every day to update me about his life in the United States and check on me. He and I would discuss the latest developments in his children's lives. He would also update me about the life he was building with his partner. In late January 2025, Miguel's partner called me and told me that Miguel had been arrested for a traffic violation and was in immigration detention.

4.      The time during which Miguel was held in immigration detention was terrible. I worried about him constantly, and I had no way to communicate with him. Thankfully, his partner served as our intermediary. They spoke daily, and she would relay messages from me to Miguel and tell me how he was doing. Miguel was given a court date to go before an immigration judge on April 8, 2025.

5.      Around early March 2025, Miguel was transferred from the detention center in Louisiana to one in Texas. I heard from Miguel's partner on Friday, March 14, that he was being deported. However, he never arrived in Venezuela.

6.      On Monday, March 17, news broke that 238 Venezuelans had been deported and thrown into prison in El Salvador. My heart sank. I knew that Miguel

DECLARATION OF DORYS MENDOZA

1   was among those men. On Thursday, that fear was confirmed when the list of

2   deported men was published, and Miguel's name was on it.

3        7.    Through the news, I came to understand that the U.S. government was

4   accusing Miguel and all the other men of being members of the Tren de Aragua

5   gang. This accusation is absurd. Miguel is not a gang member. He has no criminal

6   record in the United States or anywhere else. He has always been a responsible,

7   calm person who avoids trouble.  He is a son devoted to his family's needs, a good

8   father, and a kind person.

9        8.    Miguel has a few tattoos, as do many people in Venezuela. Tattoos are

10  quite fashionable among young Venezuelans. Miguel's tattoos include the names of

11  his children, and a clock that shows the time of his daughter's birth. The fact that

12  this was apparently the reason that he was labeled a gang member makes no sense

13  to me.

14       9.    Every day since finding out that Miguel was wrongfully sent to El

15  Salvador has been full of anguish. I do not know if my son is alive, or if he is hurt

16  or sick or suffering. I am terrified that I will never see him again. Miguel's children

17  need their father. Miguel also deserves to be treated fairly and according to the

18  laws.

19       10.   On April 24th, 2025, I called ICE's Enforcement and Removal

20  Operations Detention, Reporting and Information Line (DRIL) at 1-888-351-4024

21  to request information about my son, who is detained at CECOT, and to speak with

22  him. ICE refused to answer my questions and stated that they could not allow me to

23  speak with my son.

24       11.   I believe that it is in Miguel's best interest to participate as a named

25  petitioner in this case and to have the opportunity to challenge the use of the Alien

26  Enemies Act to remove him. I know that he would want to return to the United

27  States so that he can defend himself in a lawful proceeding. I respectfully ask that

28

1  Miguel be allowed to return to the United States to challenge his detention and

2  removal.

3      12.    I declare under penalty of perjury that the foregoing is true and correct,

4  and that this declaration was executed in Colombia this 24th day of April, 2025.

5

6                                          Dorys Mendoza

7                                          Dorys Mendoza

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DORYS MENDOZA

CERTIFICATE OF INTERPRETATION AND AFFIRMATION

I, Emilia Garcia, certify that I am fluent in Spanish and English and that I am competent to interpret between these languages. I further certify that I have read the foregoing to Dorys Mendoza in Spanish. I further declare that I am competent to render this interpretation and that I would testify to the same under the penalty of perjury if I were called upon to do so.

Executed on April 24, 2025 at Loomis, California.


_____

Emilia Garcia



# UNITED STATES
# POSTAL SERVICE ®

## PRIOR
## MAIL

Retail

US POSTAGE PAID

**$13.25**

Origin: 06096
06/13/25
0833620199-20

**PRIORITY MAIL®**

3 Lb 11.20 Oz

RDC 03

EXPECTED DELIVERY DAY: 06/18/25

C003

SHIP TO:

333 CONSTITUTION AVE NW
WASHINGTON DC 20001-2802



USPS TRACKING® #

9505 5106 0008 5164 1281 43



delivery date specified for domestic use.

shipments include $100 of insurance (restrictions apply).*

cking® service included for domestic and many international destinations.

ternational insurance.**

d internationally, a customs declaration form is required.

s not cover certain items. For details regarding claims exclusions see the Domestic
http://pe.usps.com.
ional Mail Manual at http://pe.usps.com for availability and limitations of coverage.

**ING ENVELOPE**
MESTIC AND INTERNATIONAL U

# UNITED STATES
# POSTAL SERVICE ®

**PRIORITY MAIL**

VISIT US AT USPS.COM®
ORDER SUPPLIES ONLINE

**FROM:**

Paul M Dorsey
110 Westminster Dr
West Hartford, CT 06117

**TO:**

U.S. Court of Appeals - D.C. Circ.
333 Constitution Ave NW
Washington, D.C. 20001

dule free Package Pickup,
scan the QR code.



JSPS.COM/PICKUP

**CKED ■ INSURED**



00000133100

EP14 July 2022
OD: 15 x 11.625

Label 228, December 2023     FOR DOMESTIC AND INTERNATIONAL USE

**VISIT US AT USPS.**
ORDER FREE SUPPLIES ONE